IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:10-CR-00296-FL

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM AND** |
| | ) | **RECOMMENDATION** |
| ERNEST JAMES MCDOWELL, JR., | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the Court on the motion of Defendant, Ernest James McDowell, Jr.

("McDowell" or "Defendant"), to suppress evidence seized as a result of a traffic stop of McDowell

and a subsequent search of his residence [DE-31]. The Government has responded [DE-33]. To

further develop the record, the Court conducted an evidentiary hearing on January 14, 2011, at which

the Government and McDowell with his counsel appeared. This matter is now ripe for decision.

I.      STATEMENT OF THE CASE

On August 26, 2010, the Grand Jury issued a two count indictment charging that: "On or

about August 4, 2010, in the Eastern District of North Carolina, the defendant, ERNEST JAMES

MCDOWELL, JR., did knowingly and intentionally possess with intent to distribute a quantity of

heroin, a Schedule controlled substance, in violation of Title 21, United States Code, Section 841

(a) (1)," and "On or about August 4, 2010, in the Eastern District of North Carolina, the defendant,

ERNEST JAMES MCDOWELL, JR., having been convicted of a crime punishable by imprisonment

for a term exceeding one (1) year, did knowingly possess in and affecting commerce a firearm,

specifically, a .44 caliber Taurus revolver, in violation of Title 18, United States Code, Sections

922(g) (1) and 924." The indictment further alleged that Defendant committed the alleged violations

in Count One after at least one prior conviction for a felony drug offense and included a forfeiture notice.

On December 20, 2010, Defendant filed the instant motion to suppress. He contends that the officers lacked reasonable suspicion to search his person following a traffic stop and that probable cause did not exist to search his residence. Accordingly, Defendant contends that the searches violated the Fourth Amendment and that all physical evidence seized as a result of these searches should be suppressed.

## II.    STATEMENT OF THE FACTS

Agent Michael Scully ("Agent Scully") and Officer Tony Pennica ("Officer Pennica") were the sole witnesses at the January 14, 2011 evidentiary hearing and testified as follows.

### A.    Testimony of Agent Michael Scully

Agent Scully is employed by the City of Raleigh Police Department ("RPD") and is currently assigned to the DEA Task Force. He was involved in an ongoing investigation of McDowell. Agent Scully had received information that McDowell was involved in narcotics activity and specifically that McDowell had returned to selling heroin in Raleigh, North Carolina during the early summer of 2010 after his release from prison. On August 4, 2010, the DEA Task Force and RPD obtained information that McDowell was distributing heroin into the Durham, North Carolina area. Based on that information, the Task Force planned to attempt a buy from a distributor in Durham using a confidential source ("CS") to see if McDowell would deliver the heroin to the distributor. The CS did not know McDowell, and Agent Scully did not personally know the CS, but explained that the CS was used by the RPD, that the RPD detective handling the CS knew him and maintained contact

2

with the CS throughout the operation, and that the RPD detective working with the CS transmitted information from the CS to Agent Scully and other agents working on the case.

Agent Scully had previously learned that McDowell resided at 1511 Battery Drive[1] in Raleigh North Carolina, and agents started surveillance on his residence. Meanwhile, another agent met with the CS who had indicated that he could purchase heroin in Durham. The CS contacted his distributor in Durham, first by phone and then face to face, who indicated that he could provide the heroin but that it would take a while to get the heroin. Agent Scully did not personally witness the call or the face to face meeting between the CS and his distributor and did not know if the conversations between the CS and his distributor were monitored. Agent Scully testified that the RPD detective working with the CS was not present during the face to face meeting and that, in his experience, the circumstances dictate on a case by case basis what type of monitoring if any is appropriate when using a CS.

Agent Scully and the surveillance team were in contact with the RPD detective handling the CS and were subsequently informed that the CS had witnessed a call between the distributor and McDowell and that the drug transaction would take place in one (1) hour. A short time later they were informed that the transaction would take place in 30 minutes. Shortly thereafter, McDowell exited his residence and left Battery Drive in his vehicle. Agent Scully followed McDowell through Raleigh to an apartment complex where a female exited an apartment and entered McDowell's

---

[1] Agent Scully testified that a search of the Wake County Real Estate records indicated that the property at which McDowell resided was identified as both 1511 and 1513 Battery Drive. Defendant's counsel has raised no issue regarding this apparent conflict in the real estate records. The agents referred to McDowell's residence as both 1511 and 1513 during their testimony.

3

vehicle. McDowell never left his vehicle while at the apartment complex. He proceeded with the female passenger across Raleigh and then west in the direction of Durham. Agent Scully believed that McDowell was heading to meet the CS's distributor in Durham and requested that the Wake County Sheriff's Office Interdiction Team ("Wake County Officers") start following McDowell. The Wake County Officers began following McDowell and observed him speeding, at which point they initiated a traffic stop. McDowell responded to the Wake County Officers' blue lights and stopped his vehicle.

Agent Scully proceeded past the location where McDowell was stopped and pulled into a lot further down the road where he had a view of the traffic stop. However, Agent Scully testified that he did not watch the traffic stop, but was instead communicating with other agents regarding how to proceed. It was Agent Scully's understanding that during the traffic stop the officers ran McDowell's license and registration and that they were in order. He did not know whether the Wake County Officers checked for outstanding warrants, but he testified that McDowell was not wanted at that time. He was also unaware as to whether the Wake County Officers ultimately issued McDowell a citation for speeding.

Agent Scully testified that a K-9 unit was part of the Wake County Sheriff's Office Interdiction Team that was trailing the surveillance of McDowell's vehicle and that the K-9 unit was just east of the traffic stop. The Wake County Officer's called for the K-9 unit after the stop was initiated. Agent Scully did not see the K-9 unit arrive, but was alerted by Investigator Matthews, who was with Agent Scully at the time, when the K-9 unit arrived on the scene of the traffic stop and testified that it was not more than 15 minutes after the traffic stop was initiated. Agent Scully

4

testified that the dog alerted to the interior compartment, between both front seats, of McDowell's vehicle and that the officers found nothing when they searched the vehicle's interior compartment. The officers then searched McDowell and the female passenger and found heroin in McDowell's front pants pocket. The heroin seized from McDowell was packaged in two distinct ways: one half inch wax baggies with colorful rubber bands and smaller bags stamped "one hit wonder" in red. McDowell was arrested and transported to the Wake County Sheriff's Department where declined to be interviewed by law enforcement.

Following McDowell's arrest, the female passenger was brought to Agent Scully's location where she was questioned by Scully. She said that she thought she and McDowell were going to a club in Durham and that she knew about McDowell's past but thought he was no longer involved with narcotics. She told Agent Scully that she lived at the apartment where McDowell picked her up and that he kept some personal items in her apartment and had a key for emergencies but did not reside there full-time. She consented to a search of her apartment, and the RPD found heroin in a secondary bedroom among McDowell's belongings. The heroin found in her apartment was packaged in a similar manner, with regard to the bags and elastic bands, as the larger bags of heroin found on McDowell during the traffic stop.

About the same time as the search of the female passenger's apartment, RPD Detective Marshburn applied for and received a state search warrant for McDowell's residence. Agent Scully was present when the search warrant was executed on McDowell's Battery Drive residence. McDowell's mother was present at the residence and indicated that a locked bedroom belonged to McDowell. Agent Scully unlocked the door with a key from McDowell's key ring from the vehicle

5

he was driving when arrested. A search of McDowell's bedroom closet revealed 15 bundles of heroin stamped with "one hit wonder" found in a jacket, 14 bundles of heroin that included some "one hit wonder" and some larger bags of heroin found in a second jacket, and a loaded .44 caliber revolver with an additional six rounds of ammunition. The officers also seized approximately $1,000.00 and a bag of rubber bands similar to those used on the larger bags of heroin found on McDowell during the stop and at the female passenger's residence.

### B. Testimony of Officer Tony Pennica

Officer Pennica is employed as a Detective with the City of Raleigh Police Department and is currently assigned to the DEA as a Task Force Officer. He is familiar with McDowell and was involved in the investigation. On August 4, 2010, Officer Pennica was assigned to conduct perimeter surveillance at New Bern Avenue near McDowell's residence on Battery Drive. He was alerted by radio that McDowell was leaving his residence in a Honda Ridgeline and began following McDowell at New Bern Avenue. He followed McDowell's vehicle, which appeared to be on route to Durham where the meet was arranged, until McDowell was stopped by the Wake County Sheriff's Officers.

Officer Pennica did not participate in the traffic stop, but observed it through binoculars from a nearby parking lot for 15 to 20 minutes. Officer Pennica did not watch the stop constantly and did not recall seeing McDowell out of his vehicle during the stop or seeing the K-9 unit walking around McDowell's vehicle. He did not recall seeing the Wake County Officers search McDowell during the traffic stop and did not recall whether the drugs were found in the vehicle or on McDowell's person.

6

Officer Pennica accompanied Detective Marshburn, the affiant, to obtain the search warrant for 1511 Battery Drive and was familiar with the facts supporting the affidavit. Officer Pennica summarized those facts as follows: McDowell left his residence after a CS made a heroin order; he was followed to a location on Glenwood Avenue en route to Durham, North Carolina where the meet was to have been arranged; and after a stop of McDowell's vehicle, a quantity of heroin was located. Officer Pennica was familiar with McDowell's residence from conducting surveillance and testified that a photo of 1511 Battery Drive was also included in the affidavit for the search warrant. Officer Pennica assisted in the execution of the search warrant.

## III.   DISCUSSION

Defendant contends that all evidence seized in connection with his arrest and the subsequent search of his residence should be suppressed because (1) the officers lacked reasonable suspicion to search his person following a traffic stop, and (2) no probable cause existed to search his residence.

### A.     Reasonable Suspicion

> "Reasonable suspicion" is demonstrated when an officer point[s] to specific and articulable facts which, taken together with rational inferences from those facts, evince more than an inchoate and unparticularized suspicion or hunch of criminal activity. We have recognized that this standard is not readily, or even usefully, reduced to a neat set of legal rules, but, rather, entails common sense, nontechnical conceptions that deal with factual and practical considerations of everyday life. For that reason, in assessing reasonable suspicion, courts must consider the totality of the circumstances and give due weight to common sense judgments reached by officers in light of their experience and training.

*United States v. Mason*, No. 07-4900, ___ F.3d ___, 2010 WL 4977817, at *3 (4th Cir. Dec. 8, 2010) (internal quotation marks and citations omitted). With this standard in mind, the Court will consider Defendant's contentions.

7

Defendant first contends that the "uncorroborated assertions" by the CS that Defendant was en route to a drug deal were not sufficiently reliable to justify a K-9 sweep of Defendant's vehicle and a search of Defendant's person. The Court finds this argument without merit.

First, the CS in this case was not akin to an anonymous tipster. Although Agent Scully did not personally know the CS, he testified that the CS was known to and used by the RPD, that the RPD detective handling the CS knew him and maintained contact with the CS throughout the investigation, and that the RPD detective working with the CS transmitted information to Agent Scully and other agents throughout the investigation. Furthermore, the fact that the CS did not directly communicate with McDowell does not negate the reliability of his information. *See United States v. Artez*, 389 F.3d 1106, 1112-13 (10th Cir. 2004) (concluding that the use of an intervening unwitting informant as a middleman between a confidential informant and a suspect did not invalidate a controlled purchase) (citing *United States v. Blackwood*, 913 F.2d 139, 142-43 (4th Cir. 1990) (rejecting argument that affidavit failed to establish probable cause, in part, because it lacked indicia of reliability regarding the actual purchaser of drugs, a non-informant intermediary between the suspect and the informant)). Additionally, the actions of Defendant, for example leaving his residence after the CS informed the RPD detective that the deal was about to take place and driving in the direction of the location where the deal was arranged to take place, corroborated the information that the CS provided.

Next, the stop and detention of Defendant was not unreasonable prolonged by the K-9 sweep. Agent Scully and Officer Pennica both testified that the traffic stop lasted approximately 15-20 minutes. While neither watched the stop in its entirety, they were both tailing Defendant when he

8

was pulled over and they were both alerted when the stop was concluded. Accordingly, the Court finds their testimony as to the length of the stop credible. A 15-20 minute traffic stop is not unreasonable delay. *See Mason*, 2010 WL 4977817, at *8 (collecting cases approving stops of 15, 20, and 35 minutes). Furthermore, the officers had reasonable suspicion to believe that Defendant may have been engaged in illegal activity and in possession of narcotics based on their investigation of Defendant, their knowledge of his prior history dealing with narcotics, the information provided by the CS that a drug transaction was imminent, and Defendants own actions in conformity with the information provided by the CS. *See United States v. Robinson*, 221 F. App'x 236, 240-41, 2007 WL 869159, at *4 (4th Cir. Mar. 22, 2007) (finding continued detention justified because Appellant's actions on the day in question created a reasonable suspicion that he was engaged in criminal activity). This reasonable suspicion would justify an extended stop beyond the time necessary to perform the incidents of a routine traffic stop. *United States v. Branch*, 537 F.3d 328, 336 (4th Cir. 2008). The alert by the K-9 on the passenger compartment provided police with probable cause to arrest and search Defendant. *United States v. Sinclair*, 983 F.2d 598, 602 (4th Cir. 1993) (citing *Florida v. Royer*, 460 U.S. 491, 506 (1983)). Accordingly, the Court finds no Fourth Amendment violation resulting from the traffic stop and subsequent search of Defendant.

B.    **Probable Cause**

Defendant next contends that no probable cause existed to search his residence because the affidavit submitted in support of the search warrant lacked a nexus between any narcotics and the residence to be searched. The Court disagrees.

9

This Court has previously held that "the nexus between the place to be searched and the items to be seized may be established by the nature of the item and the normal inferences of where one would likely keep such evidence." *United States v. Cubias-Rivas*, No. 5:09-CR-152-FL, 2009 WL 4127555, at *6 (citing *United States v. Anderson*, 851 F.2d 727, 729 (4th Cir.1988)). "It is reasonable to infer that an individual involved in the sale of illegal drugs would keep his drug supply in his residence . . . ." *Id.* In this case, the probable cause affidavit submitted in support of the search warrant states that (1) agents set up a drug buy through a CS; (2) shortly thereafter agents witnessed Defendant leave his residence and drive in the direction where the drug buy was to take place; and (3) that Defendant was subsequently stopped and a quantity of heroin was found on his person. The Court concludes that based on the fact that Defendant, under surveillance, left his residence and was subsequently stopped and found to be in possession of heroin creates a sufficient nexus between the heroin and the residence. Accordingly, the search warrant was supported by probable cause and the Court finds no Fourth Amendment violation as a result of the issuance of the search warrant for Defendant's residence.

## IV. CONCLUSION

The Court **RECOMMENDS** that the motion to suppress [DE-31] be **DENIED**.

The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who have fourteen (14) days from the date of receipt to file written objections. Failure to file timely written objections shall bar an aggrieved party from receiving a de novo review by the District Court on an issue covered in the Memorandum and, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions not objected to,

10

and accepted by, the District Court.

This the 31st day of January, 2011.

DAVID W. DANIEL
United States Magistrate Judge

11